UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JACK L. MCLEAN, JR.,

      Plaintiff,

v.                                                    4:23cv354–WS/MJF

THE CITY OF QUINCY, FLORIDA,
a Florida Municipality Corporation,
COMMISSIONER RONTE HARRIS,
individually and in his official capacity,
COMMISSIONER KEITH DOWDELL,
individually and in his official capacity,
COMMISSIONER ANESSA CANIDATE,
individually and in his official capacity,

      Defendants.

_____

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

      The plaintiff, Jack McLean ("McLean"), sues his former employer, the City

of Quincy, Florida (the "City"), and three (3) individuals who were City

Commissioners at all relevant times, namely Ronte Harris ("Harris"), Keith

Dowdell ("Dowdell"), and Anessa Canidate ("Canidate") (collectively, the

"Commissioners"). McLean alleges that he was fired as City Manager in

November 2021 by a majority vote of the five-member City Commission, the majority votes being cast by Harris, Dowdell, and Canidate. In Count One of his amended complaint, McLean sues the City for age and disability discrimination pursuant to the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("RA"), and Chapter 760 of the Florida Civil Rights Act ("FCRA"). In Count Two of his amended complaint, he sues all four Defendants for retaliation under the First Amendment.

Before the court at this time is Defendants' motion for summary judgment (ECF No. 64). McLean has filed a corrected response (ECF No. 78) in opposition to Defendants' motion,[1] and Defendants have replied (ECF No. 84) to that response.

I.

---

[1] In more than half of Defendants' 27-page corrected response, in a section entitled "Examination of Record Evidence," McLean complains about Defendants' alleged discovery violations. He maintains that Defendants "did not produce text messages" relevant to the case and that he was "unprepared for his deposition" because Defendants failed to fulfill their discovery obligations. McLean asks the court "to strike Defendants' answer and defenses" as a sanction. Defendants have responded (ECF No. 83) in opposition to McLean's request to strike and for sanctions. The court has reviewed the matter and finds that McLean's request to strike and for sanctions is due to be denied. The time for complaining about discovery violations is during the discovery period, not after the close of discovery and after a motion for summary judgment has been filed. McLean may not now raise the argument that Defendants failed to comply with their discovery obligations.

The parties have submitted deposition transcripts, declarations, and other documents that provide evidence of the following:

McLean served as City Attorney from 2000 to 2006 and as City Manager from 2008 to 2014. ECF No. 63–1, McLean Depo., pp. 14–15. In May 2018, Commissioner Dowdell nominated McLean as interim City Manager; Commissioner Harris seconded the motion. McLean served in an interim capacity from May 2018 until May 2019, when he executed an at-will employment agreement, providing that either party could terminate the agreement with thirty (30) days notice. *Id.* at 22–24.

McLean had been friends with Dowdell and Harris for years before he began his second stint as City Manager. That friendship was tested during McLean's second City-Manager stint. According to McLean, Dowdell's actions  toward him as City Manager became hurtful; he seemed more "power craved" than before; and he overstepped the bounds set forth in the City Charter for Commissioners, causing friction between the two. *Id.* at 26–31. Dowdell has asserted that, as early as January 2021, he started having concerns about McLean's actions as City Manager, in particular McLean's spending and its effect on the City's financial status. Dowdell explained that "though we started as friends, my impression of [McLean] changed. . . . We were always arguing about things he was doing in the

community to make it look like the Commission[ers] did not know what they were doing." ECF No. 63–4, Dowdell Decl., pp. 1–4.

McLean's relationship with Harris likewise became strained. Harris argued with McLean at City Commission meetings, openly expressing concern about McLean's lack of personnel management, his failure to address employee concerns, and his failure to demand that department management follow protocols and policies. In an email to McLean on January 19, 2021, Harris wrote that he "was extremely disappointed at the outcome of the legislative work that [McLean] put into the 2019–20 city budget." ECF No. 63–1, McLean Depo., pp. 36–40; ECF No. 63–8,  pp. 1–3. According to McLean, Harris–like Dowdell–overstepped his bounds as a City Commissioner, leading to disagreements between the two. ECF No. 63–1, McLean Depo., pp. 36–40; ECF No. 63–8, Harris Decl., pp. 1–3.

On March 19, 2021, after experiencing heart trouble in February, McLean underwent heart bypass surgery, causing him to temporarily stop working. While he was on leave, recovering from his surgery, McLean's wife, Bernice, had many positive phone conversations with Harris and Dowdell, updating them on McLean's condition. During one of those conversations, Harris suggested that McLean take paid leave for six (6) months and then return as a consultant. ECF No. 78–2, Bernice Depo., p. 15. McLean was opposed to such a plan. He returned

to work part-time on April 20, and resumed his full-time duties in May 2021. ECF No. 14, Am. Compl., ¶ 20. McLean's relations with Dowdell and Harris did not improve after his return to work.

In early July 2021, McLean, Dowdell, and Harris met for breakfast at a Cracker Barrel restaurant. The purpose of the meeting was to "to smooth out some personal issues" and to "repair[] the relationship" between McLean and Dowdell. ECF No.1, McLean Depo., pp. 100, 108. Nothing was said at this meeting to suggest that either Dowdell or Harris wanted to terminate McLean's employment because of his age and/or disability. *Id.* at 102. Before the men left the Cracker Barrel, some City business regarding the budget was briefly discussed. Specifically, Dowdell and Harris wanted the upcoming budget to include a 122% increase in pay for all commissioners—an increase that was opposed by McLean. *Id.* at 103. McLean did not then consider whether this discussion violated Florida's Sunshine Law. *Id.* at 105–109.

Soon after the Cracker Barrel meeting, McLean learned from a number of individuals that Dowdell and Harris were pushing for McLean's termination.[2]

---

[2] Those individuals included Rolanda Jackson (school board member), Sherrie Taylor (former city commissioner), Natalie Bradwell (school system employee), and Coach Livingston (high school coach). Of these individuals, only Rolanda Jackson has testified in this case, and her response to questions was basically: "I don't recall."

According to McLean's wife, Bernice, Dowdell himself told her in a July 22 phone call that McLean was "too old and too sick" to be City Manager and that he had three votes—Dowdell, Harris, and Canidate—to fire McLean at the next city commission meeting. ECF No. 78–2, Bernice Depo., pp. 18, 21. Dowdell denies that he made the "too old and too sick" comment to Bernice. ECF No. 63–5, p. 26.

In a series of text messages in late August and early September 2021, Harris voiced his frustrations about McLean's performance as City Manager. On August 26, 2021, for example, Harris texted McLean and Rolanda Jackson, writing:

> Not one goal presented in [a November 19, 2021] email has been accomplished. NOT ONE. I have a right to be pissed. . . . Nobody is defending [McLean's] leadership anymore but [Commissioner Sapp]. . . . The commission has no means of moving the city forward. It's whatever [McLean] want[s] to do and whenever [McLean] feel[s] like it.

ECF No. 63–8, Harris Decl., Attach. 3, p. 255. On August 29, 2021, Harris texted McLean:

> You should not be able to park a car in a housing complex, get out with a high powered rifle and walk around intimidating law abiding citizens without a trace. But in Quincy you can because the damn manager won't hire a chief of police or even put up surveillance when the mayor asks. You are terrible for Quincy. Please plan your exit so we can move forward.

ECF No. 63–27, p. 7. On September 11, 2021, Harris texted:

> Clearly, Jack, our values are not aligned. I need a
> manager that has better judgment in management. This is
> NOT what Quincy deserves. We deserve better. Please
> STOP holding us hostage." *Id.* at 4.

Harris's frustration with McLean's performance as City Manager was evident.
*Id.* at 6.

In late summer and early fall of 2021, Dowdell and Canidate were similarly
frustrated with McLean's performance as City Manager. Dowdell was concerned,
in particular, with the way McLean spent monies beyond the $10,000 threshold
provided in the City Charter. ECF No. 63–4, Dowdell Decl., p. 2, ¶ 5. That concern
led Dowdell to place McLean's contract on the agenda for the mid-September 2021
Commissioners' meeting. *Id.* Dowdell later removed the item from the agenda,
having been told by the City Attorney that the item may not have been properly
noticed. *Id.* at ¶ 7. Canidate was concerned about McLean's persistent lack of
response to the Commissioners' inquiries and directives, his failure to provide
necessary documents when requested or otherwise in a timely manner, and his
general mismanagement of City operations that led to inefficiencies and financial
concerns. ECF No. 63–2, Canidate Decl., ¶¶ 4–6.

At their September 28 Commission meeting, the Commissioners approved a
122% pay raise for commissioners by a three to two vote, with Commissioners
Dowdell, Harris, and Candidate casting the deciding votes. ECF No. 63–14, p. 45.

Although he opposed the size of the raise, McLean did not speak for or against the raise at the meeting. ECF No. 63–1, McLean Depo., p. 138. McLean had earlier advised Harris, who was then the mayor of Quincy, that the raise could be a political problem for the Commissioners. *Id.* at 136–38. A number of individuals from the community attended the September 28th meeting and *did* voice opposition to the raise. ECF No. 63–14, p. 44.

Unbeknownst to the Commissioners, McLean had his lawyer call the state attorney's office on September 14, to report that Dowdell and Harris had had possibly "violated the Sunshine Law requirements by conducting two secret meetings prior to the vote on September 28, 2021, to discuss the pay raises in question." ECF No. 63–20, Grand Jury Presentment, p. 4. The Cracker Barrel meeting was one of those alleged secret meetings. McLean himself met with the state attorney on October 4; and, on November 9, McLean and Dowdell, among others, appeared before the grand jury. *Id.* at 2. The allegations made by McLean were "investigated by FDLE and were either determined to be unfounded or devoid of evidence to corroborate the allegations." *Id.* at 6. As announced in its Presentment issued on March 22, 2022, the grand jury found "insufficient evidence to proceed on any criminal allegations regarding meetings occurring in violation of the Sunshine laws." *Id.* at 8. The grand jury went on to report that "the raises, in

question, while unjustified and wrong, were done legally," *id.* at 9, adding that

"[t]he action of these Commissioners in adopting the pay increase demonstrates a

self-interest which is in direct conflict with their duty to serve this community as

our representatives." *Id.* at 10-11. The grand jury recommended a charter

amendment to "prevent a recurrence of this problem going forward." *Id.* at 9.

On November 9, at a regular commission meeting, an issue regarding raises

for probationary employees was addressed. ECF No. 63–14, p. 62. Harris learned

that, after the Commission approved raises for all non-exempt employees, McLean

had sent an email stating that probationary employees would not receive the raise

until the completion of probation. *Id.* After Harris—then Mayor—expressed

frustration with McLean's failure to follow decisions voted on by the Commission,

Dowdell moved for the Commission to follow through on the previously approved

raises but to freeze all future pay raises and all hiring unless approved by the

Commission. *Id.* at 63. Although the City Attorney advised that the City Charter

was clear that the City Manager "shall employ or appoint all city employees,"

Dowdell's motion passed, with Harris, Dowdell, and Canidate all voting in favor.

*Id.* at 64. At the end of the meeting, Mayor Harris again voiced his frustration with

McLean, stating that McLean was not telling the truth and had not responded to

several emails. *Id.* at 70. McLean asked that the December meeting include an open

discussion about his future. *Id.* The Commission set December 14 as the date to review McLean's contract. ECF No. 63–25.

On November 10, the City Attorney wrote a letter to the Commission opining that the vote to freeze hiring and pay raises may have violated the City Charter. ECF 63–21, ¶ 3. On November 11, after receiving the City Attorney's letter, Harris moved the discussion of McLean's contract up from the December Commission meeting to the November 16 special meeting agenda. ECF No. 63–25, p. 2. In Harris's words:

> At this point, I was frustrated that [the Commission] could not keep McLean from doing and spending as he pleased, so I requested that his contract review be moved from a meeting in December, to a special meeting [on November 16]. I did not think the City could handle another month of McLean as manager, and had decided that I would move to terminate him at this point. I was fed up.

ECF No. 63–8, Harris Decl., ¶ 9.

On November 15, McLean—in his capacity as City Manager—filed a declaratory judgment action against the City in state court, seeking a declaration that the Commission was prohibited from implementing a hiring freeze. ECF No. 63–26. A stipulated order dismissing the case was entered on December 2, 2021, based on the parties' Resolution of the dispute. ECF No. 63–28.

At the Commission's Special Meeting on November 16, Harris moved to terminate McLean's employment as City Manager after thirty (30) days written

notice. ECF No. 63–14, p. 77. Harris reminded the Commissioners that, per

McLean's employment contract, his contract could be terminated by either party on

thirty (30) days written notice. *Id.* Harris's motion carried, with Harris, Dowdell,

and Canidate providing the deciding votes. *Id.* at 82. With notice, McLean's last

day as City Manager was December 16, 2021. The City later hired Dr. Beverly

Nash to replace McLean. ECF No. 63–1, McLean Depo., p. 163–64. Dr. Nash is

approximately one year younger than McLean. *Id.*

Before the 30-day notice period expired, McLean and the City's Director of

Human Resources and Risk Management, Ann Sherman, signed off on a check

request to pay McLean $80,225.60, which included compensation for unused sick

and annual leave. ECF No. 63–8, pp.13–14. Sherman calculated the amount

of—and completed the paperwork for—McLean's final payout. ECF No. 63–13,

p.6–7; ECF 78–6, Sherman Decl., ¶ 6. Surprised by the large amount of the payout,

Harris requested and reviewed public records regarding McLean's pay and leave,

concluding that McLean "may have violated policies and defrauded the City out of

more than $57,000." ECF No. 63–8, Harris Decl., ¶ 10. Harris organized his

findings in a binder (a public record itself), which included public records

regarding City policies and McLean's pay and leave records. McLean provided his

binder to a lawyer who was hired by the Commission to investigate McLean's

payout. *Id.* at ¶ 11. In his letter to the lawyer, which accompanied the binder,

Harris suggested "these documents support the belief that McLean may have

committed . . . fraud." *Id.* at 7. Harris also provided his binder to the local press

upon a public records request. *Id.* at ¶ 13.

The Florida Commission on Ethics ("FCE") received a complaint alleging

that McLean violated Florida law by "taking actions in order to increase his final

financial payout from the City of Quincy." ECF No. 63–13, pp. 2, 9. After

investigating the matter, FCE found probable cause to believe that McLean

violated Florida law. *Id.* at 11. The FCE case remains pending.

After his termination, McLean assisted with a petition to recall Dowdell,

Harris, and Canidate based on their vote to increase commissioners' pay by 122%.

ECF No. 63–1, McLean Depo., p. 144. The raise triggered "a lot of newspaper

articles and television coverage and became a big issue in the community." *Id.* A

counter-campaign ensued, and flyers were distributed, one claiming that McLean

"stole an $80,000 check before he left" and was "caught stealing from the City,"

ECF No. 63–29, p. 2, and another asserting that McLean "is currently being

investigated by the Florida Department of Law Enforcement for possible theft of

over $57,000 in leave payout." *Id.* at 1. The record in this case contains no

evidence that Dowdell, Harris, or Canidate created these flyers, provided

information to the persons who did create the flyers, participated in the distribution

of the flyers, or asked others to circulate the flyers. William Walker, a second or

third cousin of Dowdell, did not create the flyers but did provide some of the

information that appeared on at least one of the flyers. He was also involved in the

distribution of flyers. ECF No. 63–16, Walker Depo., p. 10–18. According to

Walker, his information came from public records and/or from different people in

the Gadsden County Citizen Review Board. *Id.* at 18–19. Walker has denied that

Harris, Dowdell or Canidate asked him to pass out the flyers. *Id.* at 36–37.

## II.

In Count One of his amended complaint, McLean sues only the City,

asserting two distinct claims under three different statutes, namely, an age

discrimination claim under the FCRA and a disability discrimination claim under

the ADA, RA, and FCRA.

"For age and disability discrimination, the plaintiff must prove that his age

or disability was a 'but-for' cause of the adverse employment action—meaning it

had a 'determinative influence on the outcome' of the employer's decision." *King

v. HCA*, 825 F. App'x 733, 736 (11th Cir. 2020) (citing *Gross v. FBL Fin. Servs.,

Inc.*, 557 U.S. 167, 176 (2009) (ADEA) and *McNely v. Ocala Star-Banner Corp.*,

99 F.3d 1068, 1077 (11th Cir. 1996) (ADA)). A plaintiff may establish claims of

age and disability discrimination through either direct evidence or circumstantial evidence.[3] *See, e.g.*, *Sanchez v. Mgmt. Enter. Dev. & Servs., Inc.*, No. 2:19cv277–ECM, 2022 WL 988378, at *7 (M.D. Ala. Mar. 31, 2022).

Direct evidence of employment discrimination is evidence "sufficient to prove discrimination without inference or presumption." *Fripp v. City of Atlanta*, No. 23–14141, 2024 WL 3983345, at *3 (11th Cir. Aug. 29, 2024) (internal quotation marks omitted). Under Eleventh Circuit precedent, direct evidence includes "only the most blatant remarks, whose intent could be nothing other than to discriminate." *Id.* (internal quotation marks omitted). A discriminatory statement can be direct evidence if the statement (1) is made by a decisionmaker; (2) specifically relates to the challenged employment decision; and (3) reveals blatant discriminatory animus. *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

If a plaintiff presents direct evidence of discrimination, the trial court must decide, first, whether the proffered direct evidence is credible, and, second,

---

[3] Although McLean has not asserted an age discrimination claim pursuant to the Age Discrimination in Employment Act ("ADEA"), federal caselaw interpreting the ADEA is instructive in cases brought under the FCRA. *Rainey v. United Parcel Serv., Inc.*, 816 F. App'x 397, 400 (11th Cir. 2020). FCRA disability discrimination claims are also analyzed under the framework established by federal disability caselaw.

whether the evidence played a substantial role in the adverse employment decision at issue. *Haynes v. W.C.Caye & Co.*, 52 F.3d 928, 931 (11th Cir. 1995). "If the trial court both credits the direct evidence and finds that the evidence played a substantial role in the employment decision at issue, then the defendant can avoid liability only by proving that it would have made the same decision even if it had not allowed such discrimination to play a role." *Id.*

Here, there is evidence that Dowdell told McLean's wife in July 2021 that McLean was "too old and too sick" to be City Manager and that he (Dowdell) had three votes to fire McLean at the next City Commission meeting. Dowdell allegedly made this statement two months after McLean returned to work following open-heart surgery and four months before Commissioners Dowdell, Harris, and Canidate voted to terminate McLean. There is no evidence in this record that either Harris or Canidate made similar statements.

Assuming, without deciding, that Dowdell in fact made the "too old and too sick" comment, the court finds that the record establishes that McLean's age and/or alleged disability did *not* play a substantial or determinative role in the decision by the three Commissioners to fire McLean. The record is rife with evidence that all three Commissioners voted to fire McLean based primarily on his job performance. The Eleventh Circuit, moreover, has made clear that "[t]here can be no municipal

liability unless all three members of the [five-member] council who voted [to take action against the plaintiff] shared the illegal motive." *Mason v. Village of El Portal*, 240 F.3d 1337, 1340 (11th Cir. 2001). That Dowdell allegedly told Bernice in July that he had three votes to fire McLean does not in any way suggest that he had three votes to fire McLean based on his age and/or disability. Because there is no evidence that Harris and Canidate shared Dowdell's alleged "too old and too sick" motive, McLean cannot prevail on his discrimination claims against the City.[4]

## III.

In Count Two of his amended complaint, McLean asserts a First Amendment retaliation claim against the City as well as Commissioners Dowdell, Harris and Canidate. McLean contends that he was fired as City Manager after he reported the Commissioners' alleged violations of Florida's Sunshine Law to the State Attorney and after he provided compulsory testimony before the Grand Jury regarding those violations. McLean also contends that the Commissioners, through

---

[4] The court would reach the same result if McLean's discrimination claims were analyzed under the *McDonnell Douglas* burden-shifting framework for cases based on circumstantial evidence. The City has articulated non-discriminatory reasons for the Commissioners' decision to fire McLean and has provided ample evidence to support those reasons; and McLean has fallen far short of establishing that those reasons are pretextual.

publicly distributed flyers, spread false and defamatory information about McLean

when McLean was campaigning—post-termination—against the Commissioners'

approval of the 122% increase in Commissioners' pay and urging the election of

the Commissioners' opponents during the Commissioners' re-election campaign.

McLean was a public employee both when he reported the Commissioners'

alleged Sunshine-Law violations to the State Attorney and when he testified before

the grand jury regarding those violations. It is well established that a state

employer, including a municipality, may not retaliate against a public employee for

speech protected by the First Amendment. *Williamson v. Ala. Dep't of Mental

Health & Mental Retardation*, No. 21-13274, 2023 WL 5287873, at *1 (11th Cir.

Aug. 17, 2023). A First Amendment retaliation claim asserted by a public

employee is governed by a four-part analysis.

> [W]e first consider whether the plaintiff's speech was made as a
> citizen and whether it implicated a matter of public concern. *Moss v.
> City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015). If so, we
> then weigh the plaintiff's interests in free speech against the
> government's interest in regulating speech to promote the efficiency of
> the public services it performs through its employees. *Id.* at 618.
> These two inquiries are questions of law decided by the court, and the
> court's resolution determines whether the plaintiff's speech is
> protected by the First Amendment. *Id.* Third, the plaintiff must show
> that his speech was a substantial motivating factor in the alleged
> adverse employment action. *Id.* Finally, if the plaintiff makes this
> showing, the burden shifts to the government to prove that it would
> have taken the adverse actions even absent the plaintiff's speech. *Id.*

*Williamson*, 2023 WL 5287873, at *2.

Where, as here, a plaintiff asserts a First Amendment retaliation claim arising from a municipal body's majority vote to terminate a public employee, municipal liability does not exist unless *all* members of the municipal body who voted for termination shared a retaliatory animus. *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002). Furthermore, where, as here, a plaintiff sues a majority of the individual members of a public body, each of whom lacks decision-making authority to act on his/her own, those members may not be held individually liable for an act of the entire body unless it is shown that each of those members acted with a shared retaliatory animus. *Carollo v. City of Doral*, No. 1:14cv23980–UU, 2015 WL 13145804, at *7 (S.D. Fla. 2015), *aff'd in part, rev'd in part, remanded on other grounds*, 833 F3d 1322 (11th Cir. 2016) (interlocutory appeal limited to questions of qualified immunity).

Even if the court assumes that McLean's pre-termination speech to the State Attorney and to the Grand Jury was made as a citizen on a matter of public concern, McLean has failed to establish that this speech was a substantial motivating factor in his firing. He has admitted that he told no one that he spoke to the State Attorney. ECF 63–1, McLean Depo., p. 114. The record is replete with evidence that Dowdell's, Harris's, and Canidate's frustrations with McLean's

performance as City Manager started and persisted for many months *before* McLean spoke to the State Attorney and to the Grand Jury. McLean, moreover, did not speak to the State Attorney or the Grand Jury until *after* he learned that the Commissioners wanted to fire him. Absent from the record is evidence indicating that all three of the Commissioners voted to fire McLean based on an unlawful retaliatory motive. Because the evidence amply shows that McLean's pre-termination speech was *not* a substantial motivating factor in his firing, and because the evidence just as amply shows that McLean would have been fired absent his pre-termination speech, McLean cannot prevail on this aspect of his First Amendment claim.

McLean also asserts a First Amendment retaliation claim based on McLean's post-termination involvement in the campaign to recall Canidate, Harris, and Dowdell. McLean contends that this post-termination speech resulted in the distribution of flyers stating—falsely and defamatorily–that McLean "was caught stealing time from the City," "stole an $80,000 check before leaving the City," and "is currently being investigated by the Florida Department of Law Enforcement for possible theft of over $57,000 in leave payout."

To state a section 1983 claim based on First Amendment retaliation, a plaintiff must show that (1) he engaged in constitutionally protected speech; (2) he

suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the adverse conduct and the protected speech. *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1315–16 (11th Cir. 2024). The Eleventh Circuit has determined that a public official's defamatory statements may support a claim for retaliation under the First Amendment. *Echols v. Lawton*, 913 F3d 1313, 1322 (11th Cir. 2019) (concluding that "sometimes defamation inflicts sufficient harm on its victim to count as retaliation" protected by the First Amendment (internal quotation marks omitted)). Whether a public official's statement is defamatory is determined by state law.[5]

Here, McLean's post-termination retaliation claim fails because, first and foremost, the record is devoid of evidence that Defendants had anything to do with the publication of the flyers. That void alone is sufficient to doom McLean's post-termination retaliation claim.

Second, even assuming—for the sake of argument—that Defendants were in some way responsible for publishing the flyers, McLean's retaliation claim would

---

[5] To prevail on a defamation claim under Florida law, McLean must prove: "(1) publication by the defendant, (2) of a false statement, (3) with knowledge or reckless disregard as to the falsity (i.e., "actual malice"), (4) which causes actual damages, and (5) is defamatory." *Flynn v. Wilson*, ___ So. 3d ___, 2024 WL 5063563, at *3 (Dec. 11, 2024).

nonetheless fail. The statement that McLean "is currently being investigated . . .

for possible theft of over $57,000 in leave payout" was not false and is not

defamatory. McLean *was* being investigated by the Florida Commission on Ethics,

which ultimately found probable cause to believe that McLean violated Florida

law. That case remains pending. The statements that McLean "stole an $80,000

check" and "was caught stealing time" from the City were made during a political

campaign at a time when there was widespread media coverage of McLean's firing

and payout. The statements are more akin to nonactionable "rhetorical hyperbole"

than actual fact. *See, e.g.*, *Flynn v. Wilson,* 2024 WL 5063563, at *4 (recognizing

that courts "have extended First Amendment protection [to expressions of

rhetorical hyperbole or opinion] in recognition of the reality that exaggeration and

non-literal commentary have become an integral part of social discourse" (internal

quotation marks omitted)). Given McLean's pay and leave records, which were a

matter of public record and which led the FCE to find probable cause of a

violation, it was at least questionable whether the statements that appeared in the

flyers were blatantly false.

Third, as a former public figure who is complaining about Defendants'

alleged speech regarding McLean's in-office activities, McLean must prove actual

malice on Defendants' part. *See, e.g.*, *Zerangue v. TSP Newspapers, Inc.,* 814 F.2d

1066, 1069 (5th Cir. 1987) (requiring former public officials to prove that "actual malice" prompted speech concerning their in-office activities (citing *Rosenblatt v. Baer*, 383 U.S. 75, 87 n.14 (1966))). "Actual malice exists when the speaker has knowledge that the statement is false or when he speaks with reckless disregard for whether it is false." *Echols*, 913 F.3d at 1321–22.

Evidence of actual malice on the part of Defendants is missing here. Even *if* the statements that appeared on the flyers derived from the binder of information gathered by Harris, there is no evidence that Harris—both a Commissioner and Mayor of Quincy—acted with malice when he questioned and investigated McLean's higher-than-normal payout, concluded that McLean *may have* committed fraud, and sent his findings to a lawyer for investigation. In sum, McLean's post-termination retaliation claim fails.

IV.

For the reasons explained above, it is ORDERED:

1. Plaintiff's request (ECF No. 78) to strike Defendants' answer and defenses is DENIED.

2. Defendants' motion for summary judgment (ECF No. 64) is GRANTED.

3. The clerk shall enter judgment in Defendants' favor stating: "Judgment is entered in favor of all Defendants and against Plaintiff on all claims."

4. The clerk shall close the case.

5. The clerk shall tax costs against Plaintiff.

DONE AND ORDERED this __28th__ day of ___January___, 2025.


s/ William Stafford
WILLIAM STAFFORD
SENIOR UNITED STATES DISTRICT JUDGE